525 A.2d 628

**William KACZOROWSKI**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE et al.**

**No. 162, Sept. Term, 1986.**

Court of Appeals of Maryland.

May 15, 1987.

**506**

Frederic M. Brandes (Peter G. Angelos, on the brief) Baltimore, for appellant.

Roger D. Redden (Francis B. Burch, Jr., Sheila Mosmiller Vidmar and Piper & Marbury for appellee Indus. Development Authority of the Mayor and City Council of Baltimore.

James R. Eyler (S. Nelson Weeks and Miles & Stockbridge and Benjamin L. Brown, City Solicitor and Robert Edelson, Asst. City Solicitor for appellee Mayor and City Council of Baltimore all on joint brief of appellees) Baltimore.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

ADKINS, Judge.

We shall here hold that the Industrial Development Authority of the Mayor and City Council (the Baltimore Authority) is not defunct, as claimed by appellant, William Kaczorowski (Kaczorowski), but is, instead, still a viable entity, as contended by appellees, the Mayor and City Council of Baltimore (the City) and the Baltimore Authority.

## I.

The facts underlying this controversy, which boils down to a question of statutory construction, are largely undisputed. We outline them.

In the beginning (which for present purposes means immediately before the opening of the 1976 session of the General Assembly) Art. 41 of the Annotated Code of Maryland (1971 Repl. Vol., 1975 Supp.) contained §§ 266A–266I, under the subheading "Industrial Buildings for Counties and Municipalities." These sections authorized counties and municipalities to issue bonds to fund industrial buildings, port facilities, and pollution control facilities. In addition, Art. 41, §§ 266J–266CC, under the subtitle "Maryland Industrial Development Financing Authority Act," created that authority (MIDFA). It was authorized to lend money, secured by mortgages, to local development corporations, municipalities, or counties, or their instrumentalities, for the general purpose of promoting industrial projects.

The legislature apparently sought improved or additional ways of achieving these ends. By Chapter 421, Acts of 1976, (the Maryland Economic Development Bond Act— hereinafter the Bond Act) it added §§ 266A(f), 266A–1, 266A–2, and 266A–3 to Art. 41. Chapter 421 was

FOR the purpose of authorizing counties and municipalities to create industrial development authorities; [and] conferring on these authorities the power to issue revenue bonds and act as mortgagors under the Maryland Industrial Development Financing Authority Act to the same extent as the incorporating county [*sic* ] and municipalities. . . .

As advertised in its title, the Bond Act provided for the creation of local industrial development authorities; for the structure, functions, power, and operating procedures of these authorities; and for their termination "by legislative act" of the incorporating municipality or county.

In 1979 the City enacted Ordinance No. 1144, establishing the Baltimore Authority, the existence of which is now at issue, ". . . under Sections 266A–1, 266A–2 and 266A–3" of Art. 41. The Baltimore Authority was duly incorporated in that same year. The tale so far is simple and straightforward. But we now turn to the series of legislative actions that caused the problem in this case—actions that produced

a situation aptly described in the trial court as "screwed up."

Chapter 791, Acts of 1982 concerned the Bond Act. It was adopted

FOR the purpose of enacting new provisions permitting counties, municipal corporations, and industrial development authorities to issue revenue bonds to assist the financing of all types of buildings, structures, facilities, and property interests for stated economic development, port and pollution control purposes....

The 1982 legislation sought to accomplish those ends by repealing, so far as is here pertinent, then-existing §§ 266A–266I, inclusive, of Art. 41, and by enacting new §§ 266A–266I, inclusive, under the new subtitle "Maryland Economic Development Bond Revenue Act." New § 266C restated, with insubstantial changes, the provisions that were contained in §§ 266A–1 through 266A–3. Section 3 of Ch. 791 was a savings provision that "validated, ratified and confirmed" the "validity of all bonds heretofore issued [under the prior law] and outstanding on the effective date [1 June 1982] of this Act...." It further provided

that any industrial development authority existing on June 30, 1982 pursuant to the provisions of law hereby repealed may continue to exist as previously authorized after the effective date of this Act, subject to and with the benefits of the provisions of this Act.

When what later became Ch. 791 was introduced as SB 215, it was completely consistent with the objectives we have outlined. One of its function clauses called for the repeal of "Sections 266A through 266I inclusive, and the subtitle 'Industrial Buildings for Counties and Municipalities.'" Section 1 of the introductory bill in fact would have repealed those subsections and that subtitle. Section 2 contained the bulk of the savings provision that later became Section 3. Section 3 (which finally became section 4) enacted new §§ 266A–266I. But the introductory bill was amended, and amended in a careless fashion. A new section 1 (not substantively important here) was inserted. Old

section 1 became section 2 and was amended so that the only sections repealed were 266A, 266B(a) through (f) and 266C through 266I. *See Maryland Senate Journal,* Vol. I at 199, Vol. II at 1119–1120 (1982). In other words, the language repealing §§ 266A–1 through 266A–3 was deleted from the bill, perhaps under the erroneous notion that they were subdivisions of § 266A. On the face of things as they stood on 1 June 1982, those three sections remained on the statute book as part of Art. 41, along with the mostly overlapping provisions of new § 266C.

In November 1982 the City Council enacted Ordinance No. 808, restricting the power of the Baltimore Authority by requiring any bond issue of the Baltimore Authority to be approved by resolution of the City. That Ordinance made reference to § 266A–3(e), which provided authority similar to that contained in § 266C(k), as enacted by Ch. 791.

By its 1983 session, the General Assembly apparently had become aware that something was amiss. To a bill (HB 1444) overhauling the MIDFA Act it added a section 3 repealing §§ 266A–1 through 266A–3 of Art. 41, effective 1 July 1983. The title of the bill, which became Ch. 73, Acts of 1983, reflects that one of its purposes was to correct "certain errors in Chapter 791 of the Laws of Maryland of 1982 by repealing" those sections. The 1983 enactment also contained, in section 4, a provision validating, ratifying and confirming "the validity of all loans made and bonds heretofore issued under the Maryland Industrial Development Financing Authority Act ..., any insurance agreement, heretofore entered into under that Act ..., and any transaction affected by or flowing from the provisions of law hereby repealed, and entered into or officially acted on by the Authority or any public body before the effective date of this Act...."

In 1986 the City adopted Resolution 92, amending the charter of the Baltimore Authority pursuant to § 266C, in order to conform the charter to the provisions of Art. 41, §§ 266A through 266I, as enacted by Ch. 791 of 1982. It

also adopted Resolution No. 93, giving the Baltimore Authority power to issue, sell and deliver $100,000,000 in revenue bonds. Those bonds were issued on 28 August 1986. Some three months later appellant Kaczorowski filed this action in the Circuit Court for Baltimore City.

Kaczorowski's complaint sought, among other things, a declaration that "the Industrial Development Authority of the Mayor and City Council of Baltimore is defunct for all financial transactions instituted after July 1, 1983" and a "permanent injunction against any and all new financial transactions by" the Baltimore Authority. On 6 January 1987 Judge Kaplan declared:

> that the Industrial Development Authority of the Mayor and City Council of Baltimore is a validly existing corporate body and has continued as such since its incorporation; that all transactions undertaken and/or performed by the Industrial Development Authority of the Mayor and City Council of Baltimore were undertaken and/or performed by a validly existing corporate body; that the Articles of Amendment approved by the Mayor and City Council of Baltimore in Ordinance 808 are valid and effective; that the Articles of Amendment approved by the Mayor and City Council of Baltimore in Resolution 92 are valid and effective; and that Resolution 93 approved by the Mayor and City Council of Baltimore and the action taken pursuant thereto is valid and effective.

Kaczorowski appealed to the Court of Special Appeals. Because of the importance of the matter, we granted certiorari before argument in that court, and advanced the case on our docket.

II

Kaczorowski's attack on the Baltimore Authority is direct and simple. Chapter 791 of 1982 unambiguously did not repeal §§ 266A–1 through 266A–3. It unambiguously created an alternative mechanism for creating an industrial development authority (new § 266C). The savings clause contained in section 3 is also unambiguous; it merely reach-

es "an impossible result" because there is nothing to save. Chapter 73 of 1983 unambiguously did repeal §§ 266A–1 through 266A–3. Since it was under these sections that the Baltimore Authority had been formed and since they were repealed in 1983, the Baltimore Authority is no more. The 1983 savings clause by its plain wording does not save it. We cannot add words to the 1982 or 1983 enactments to somehow transfer authorization for the Baltimore Authority from former §§ 266A–1 through 266A–3 to new § 266C. In support of these arguments Kaczorowski cites cases such as *Comptroller v. Fairchild Industries,* 303 Md. 280, 493 A.2d 341 (1985); *Board of Education v. Lendo,* 295 Md. 55, 453 A.2d 1185 (1982); *Slate v. Zitomer,* 275 Md. 534, 341 A.2d 789 (1975), *cert. denied, sub nom. Gasperich v. Church,* 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87 (1976); *Firestone Tire & Rubber Co., Inc. v. Supervisor,* 275 Md. 349, 340 A.2d 221 (1975); and *Salzman v. State,* 49 Md.App. 25, 430 A.2d 847 (1981). Each of those cases states certain canons of statutory construction that support his position.

The City and the Baltimore Authority, on the other hand, invoke other canons of construction. They posit that the cardinal rule of statutory construction is to determine legislative intent. *Comptroller v. Fairchild Industries, supra; Management Personnel Serv., Inc. v. Sandefur,* 300 Md. 332, 478 A.2d 310 (1984). In ascertaining this intent, a court should consider the purpose or objective of an enactment, *Guardian Life Ins. Co. of America v. Ins. Comm'r,* 293 Md. 629, 446 A.2d 1140 (1982), and statutes dealing with the same subject matter should, when possible, be read together and harmonized. *Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983); *Commission on Medical Discipline v. Bendler,* 280 Md. 326, 373 A.2d 1232 (1977); *Dept. of Natural Resources v. France,* 277 Md. 432, 357 A.2d 78 (1976). When these canons are applied, argue appellees, it is apparent that the General Assembly did not intend to eliminate the Baltimore Authority, but rather to continue its existence.

■ We are faced with a battle between contending canons of construction. Just as in the science of Physics every action has an equal and opposite reaction, so it seems that every canon of statutory construction has an equal and opposite canon.[1] Indeed, it has been suggested that the canons of construction should be abandoned because they "obscure the factors actually at work in the construction of statutes." Sykes, *A Modest Proposal for a Change in Maryland's Statutes Quo*, 43 Md.L.Rev. 647, 666 (1984). Instead, this Court "should turn ... to the task of explaining more forthrightly its reasons for adopting a particular construction in an individual case." *Id.* at 667.[2] Nevertheless, the canons have long been with us. To a considerable extent they are founded on both logic and common sense. Indeed, objections to them seem to be based more on the way in which they have been used, rather than on their content. But properly used, they afford an opportunity for principled decision making, as opposed to ad hoc judicial legislation. It is sound policy for a court to recognize legislative pre-eminence, subject to constitutional restraints, when legislation is involved. We shall apply the canons here, and at the same time attempt to give forthright explanations for the result we reach.[3]

---

1. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes are to be Construed*, 3 Vand.L. Rev. 395, 401–406 (1950) (listing 28 opposing pairs of canons of statutory construction). For a recent listing of some, though far from all, of the canons applied in Maryland, *see Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 73–75, 517 A.2d 730, 731–732 (1986).

2. *See also, e.g.,* Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 544 (1947): "Nor can canons of construction save us from the anguish of judgment. Such canons give an air of abstract intellectual compulsion to what is in fact a delicate judgment, concluding a complicated process of balancing subtle and elusive elements."

3. The dueling character of statutory construction is not, of course, troublesome only to state courts. Federal courts painfully grapple with the canons as well. Compare *United States v. Underhill*, 813 F.2d 105 (6th Cir.1987) (after conceding that the literal language of the 1968 Omnibus Crime Control and Safe Streets Act bars admission of

## III

However fictional the notion of institutional intent may sometimes be, it is fair to say that legislation usually has some objective, goal, or purpose. It seeks to remedy some evil, to advance some interest, to attain some end. If we characterize the search for legislative intent as an effort to "seek to discern some general purpose, aim, or policy reflected in the statute," Sykes, 43 Md.L.Rev. at 653, we state the concept more accurately and avoid the fiction. *See also* Cox, *Judge Learned Hand and the Interpretation of Statutes,* 60 Harv.L.Rev. 370, 370–71 (1947).

■ Of course, in our efforts to discover purpose, aim, or policy we look at the words of the statute. That is the thrust of the plain-meaning rule relied on by Kaczorowski, and the rule comports with common sense, because what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal. But the plain-meaning rule is not rigid.

We also recognize the rule that where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. *State v. Fabritz,* 276 Md. 416, 348 A.2d 275 (1975); *Height v. State,* 225 Md. 251, 170 A.2d 212 (1961). In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

---

tape recordings made by private persons for the purpose of committing a crime, the court refused to apply the plain language, reasoning that suppression of the tapes would not promote the Congressional intent of the wiretap statute) with *United States v. Vest,* 813 F.2d 477 (1st Cir.1987) (under similar facts the court refused to discard the literal language of the same statute and held that a tape recording made by a private person for the purpose of committing a crime is illegal and inadmissible).

*Tucker,* 308 Md. at 75, 517 A.2d at 732 [some citations omitted].

Moreover, despite Kaczorowski's pleas that we examine the trees so closely that we do not see the forest, the plain-meaning rule does not force us to read legislative provisions in rote fashion and in isolation. What we are engaged in is the divination of legislative purpose or goal. Indeed, as we have explained, the plain-meaning rule "is not a complete, all-sufficient rule for ascertaining a legislative intention...." *Darnall v. Connor,* 161 Md. 210, 215, 155 A. 894, 896 (1931). The "meaning of the plainest language" is controlled by the context in which it appears. *Guardian Life Ins.,* 293 Md. at 642, 446 A.2d at 1147. The aim or policy of the legislation, against which we measure the words used, is "not drawn ... out of the air; it is evinced in the language of the statute as read in the light of other external manifestations of that purpose." Frankfurter, 47 Colum.L.Rev. at 538–39. Or as Justice Holmes once put it, "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States v. Whitridge,* 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696, 698 (1905). More recently, the Supreme Court has stated the proposition thus:

> We agree ... that '[t]he starting point in every case involving construction of a statute is the language itself.' But ascertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have this literal effect.

*Watt v. Alaska,* 451 U.S. 259, 265–266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80, 88 (1981) [citations and footnote omitted].

■ When we pursue the context of statutory language, we are not limited to the words of the statute as they are

printed in the Annotated Code. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

Sometimes the language in question will be so clearly consistent with apparent purpose (and not productive of any absurd result) that further research will be unnecessary. *See Taylor v. Dept. of Employment and Training,* 308 Md. 468, 472, 520 A.2d 379, 381 (1987). But on other occasions much more extensive inquiry will be required. Thus, in *State v. One 1983 Chevrolet Van,* 309 Md. 327, 524 A.2d 51, (1987), we held that when a motor vehicle is forfeited under Art. 27, § 297, and is then sold in a commercially reasonable manner, the person who owned it prior to forfeiture is not prohibited from purchasing it. 309 Md. at 345–47, 524 A.2d at 60. Although we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." At 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form (At 327–30, 524 A.2d at 51–52), prior legislation (At 330, 524 A.2d at 52), a legislative committee report (At 331, 524 A.2d at 53), a bill title (At 331, 524 A.2d at 53), related statutes (At 335–41, 524 A.2d at 55–58) and amendments to the bill (At 341–44, 524 A.2d at 58–59). *See also Ogrinz v. James,* 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning. At 390, 524 A.2d at 82.

We took a similar approach in *Potter v. Bethesda Fire Department*, 309 Md. 347, 524 A.2d 61 (1987). There, Judge Orth, quoting *State v. Fabritz*, 276 Md. 416, 421–422, 348 A.2d 275, 278–279 (1975), *cert. denied.* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976), made it plain (At 351–55, 524 A.2d at 63–64) that legislative purpose is critical, that purpose must be discerned in light of context, and that "statutes are to be construed reasonably with reference to the purpose to be accomplished...." The purpose, in short, determined in light of the statute's context, is the key. And that purpose becomes the context within which we apply the plain-meaning rule. Thus " 'results that are unreasonable, illogical or inconsistent with common sense should be avoided ... with the real legislative intention prevailing over the intention indicated by the literal meaning.' " *Id.* at 353, 524 A.2d at 64.[4]

We now proceed to apply these teachings to the case before us.

## IV.

In this case we are not dealing with a single word in a statute, as we were in *Tucker*, but with two Acts, passed in successive years. Both concern (at least in part) the same subject matter, so they should be read together. *See In re Criminal Investigation No. 1-162*, 307 Md. 674, 690, 516 A.2d 976, 985 (1986); *Greco v. State*, 307 Md. 470, 478, 515 A.2d 220, 224 (1986); *Equitable Life Assurance v. Jalowsky*, 306 Md. 257, 263, 508 A.2d 137, 140 (1986); *Montel v. Consolidation Coal Co.*, 39 Md. 164 (1874). And it is from that reading, as well as from the general context in which

---

**4.** We do not mean to suggest that a court is wholly free to rewrite a statute merely because of some judicial notion of legislative purpose. *See Birmingham v. Board of Public Works*, 249 Md. 443, 239 A.2d 923 (1968) (where true legislative intent can be ascertained it will prevail over precise grammatical construction or literal intent, but this principle does not permit court to insert in statute constitutionally-mandated provision that legislature has omitted).

they were passed, that we should make our determination as to the legislative purpose.

We first look at Ch. 791, Acts of 1982. As we have seen, this dealt with the Bond Act—a measure designed to promote economic welfare by providing mechanisms for the issuance of industrial revenue bonds. What later became Ch. 791 was the result of a study conducted by the House Economic Matters Committee. In its 1980 interim report to the 1981 General Assembly, that committee indicated a desire to simplify and clarify the Bond Act, and stated that it had requested the Maryland State Bar Association to draft legislation to that end. *Reports of Legislative Committees to 1981 General Assembly* (1980 Interim) at 100, 106. Attached to the report is draft legislation which is remarkably similar to what became the introductory form of SB 215 of 1982, and ultimately Ch. 791. The context, then, of Ch. 791 was the carefully considered purpose of enhancing the effectiveness of the industrial revenue bond process.

As we have also seen, Ch. 791 shows on its face that something went awry during its enactment. That is the context of the corrective portion of Ch. 73, Acts of 1983, a bill otherwise dealing with MIDFA, an agency closely involved in the matter of industrial revenue bonds. When we look at those two Acts together, with reference to the context in which each was enacted, no uncertainty remains as to whether their purpose was to do away with existing industrial development authorities. This is especially obvious if we consider the words of these statutes in light of their purpose and objective, adopting a construction that comports with common sense and avoids illogical or absurd results.[5]

---

**5.** We thus avoid the danger of unreasoning and unreasonable literalism in statutory interpretation. *See Cearfoss v. State,* 42 Md. 403, 406–407 (1875) (statute not to be followed in its literal terms, if it can be discovered that this was not the intention).

For example, in *Erwin & Shafer Inc. v. Pabst Brewing Co.*, 304 Md. 302, 498 A.2d 1188 (1985), we refused to construe the Maryland Beer Franchise Fair Dealing Act, Art. 2B, § 203 *et seq.*, as requiring beer manufacturers to distribute all their beer brands through a single distributor in one territory. Such a construction would have the absurd result of jeopardizing the rights of all beer distributors, and render the protective shield of the statute ineffective. Similarly, in *Kindley v. Governor of Maryland*, 289 Md. 620, 426 A.2d 908 (1981), the public funding of abortion under Art. 43 § 42 was challenged on the basis that at the time the statute was amended in 1967 to provide for " 'comprehensive medical and other care in the State of Maryland for indigent and medically indigent persons ...,' " abortion was a criminal offense, legally performable only to secure the safety of the mother or where the fetus was dead. 289 Md. at 624, 426 A.2d at 911. We declined to construe the statute as providing a limitation on the public funding of abortion. We reasoned that Art. 43 § 42 did not address medical procedures, and to construe the limitation "would require the absurd result of precluding from coverage any medical procedure which may not yet have been developed, in general use, or legal as of 1967." 289 Md. at 624–625, 426 A.2d at 911–912. *See also Johnson v. State*, 274 Md. 29, 333 A.2d 37 (1975), and *Brown v. State*, 237 Md. 492, 207 A.2d 103 (1965) (both construing rules through the reasonable intendment of the language used in light of the purpose to be effectuated).

■ To assume that the General Assembly, when it enacted the two Acts now before us, had the purpose or object of abolishing the Baltimore Authority and invalidating the bonds it issued in 1986 is indeed to assume an absurdity, and a result totally at odds with the objective of enhancing the effectiveness of the Bond Act. Indeed, the amendment augmenting the savings provision in SB 215, offered by the House of Delegates Economic Matters Committee, makes the legislative intent self-evident: "[amendment 3] [c]larifies that the bill does not alter the existence of any current

Industrial Development Authority." *See* Committee on Economic Affairs, Notes to SB 215, General Assembly Session (1982). Nor does the construction proposed by Kaczorowski comport with harmonizing the 1983 and 1982 Acts.

The 1983 Act, it will be recalled, repealed Art. 41, §§ 266A–1 through 266A–3 explaining that in doing so it was correcting the failure of Ch. 791 of 1982 to accomplish this. There is no doubt that the three sections were repealed in 1983, and there is no doubt that the legislature's purpose was to repeal them; indeed, it had the purpose of doing so in 1982, as part of its goal to improve industrial revenue bond procedures. Through a patent mistake in the amendment process, that purpose was not achieved in 1982. Thus, from 1 June of that year to 1 July 1983 there existed parallel provisions pertaining to the creation, structure, and powers of industrial revenue bond authorities. The savings clause contained in section 3 of Ch. 791 seemed to serve no purpose. But it was not inserted in Ch. 791 idly. It was inserted because, as introduced, the bill did repeal the sections under which existing authorities had been established. It manifested a clear and sensible purpose that those authorities be continued in existence. When the General Assembly repealed the three sections in 1983, that purpose was not nullified or modified. Having saved existing authorities in 1982, there was no need to do so again in 1983, when one of the aims of the 1982 Act (the repeal of the three sections) was finally achieved. *See* Economic Matters Committee, *Notes to Proposed Modifications to Maryland Industrial Financing*, HB 1444, General Assembly Session (1983) (the bill was in part designed to "[a]mend the [Bond Act] to delete superfluous provisions").

Moreover this construction, unlike Kaczorowski's, treats no part of either Act as surplusage. *Management Personnel Serv., Inc. v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 315 (1984). The 1982 savings clause remains viable. So does the 1983 savings provision. The latter has nothing to do with the independent obligations of the Baltimore Au-

thority, it has to do with those of MIDFA—the agency with which Ch. 73 is chiefly concerned.

Thus, if we view Ch. 791 of 1982 and Ch. 73, Acts of 1983 as part of a legislative continuum, the Baltimore Authority remains alive and so do its bonds. It has never been defunct. *See Watts v. Village of Port Deposit,* 46 Md. 500, 503–504 (1877); *Dashiell v. Baltimore,* 45 Md. 615, 624 (1877); *Montel v. Consolidation Coal Co.,* 39 Md. 164 (1874). We so hold.[6]

Our conclusion avoids an absurd result, harmonizes the 1982 and 1983 Acts, and achieves an outcome wholly consistent with the legislative goal of improvement of the Bond Act mechanism. We shall not permit a patent drafting error to frustrate this goal by bringing about the demise of the Baltimore Authority.

JUDGMENT AFFIRMED. APPELLANT TO PAY THE COSTS.

---

**6.** It is immaterial that the City's ordinance 808 of 1982 referred to one of the three sections ultimately repealed in 1983. The purpose of the reference was to cite particular authority contained in the Bond Act—authority contained in new § 266C as well as in now-repealed § 266A–3. The inept (as it now appears) reference is essentially no more than a typographical error. Furthermore, what the City said in an ordinance tells us nothing about the General Assembly's purposes in enacting a law.