Dear Mr. Schertle:
You have requested our opinion on the legality of interstate "cross-breed" simulcasting: the simulcasting of, and pari-mutuel betting on, out-of-state thoroughbred races at a Maryland harness track or affiliated off-track betting facility; or the simulcasting of, and pari-mutuel betting on, out-of-state harness races at a Maryland thoroughbred track or affiliated off-track betting facility.[1]
The question presents a very difficult issue of statutory construction. The relevant statutory text, § 11-804(b) of the Business Regulation ("BR") Article, Maryland Code, authorizes interstate cross-breed simulcasting, if the Racing Commission approves it. Nevertheless, we recognize that a straightforward reading of this language opens the door to results that the General Assembly did not contemplate and therefore never intended.
For fourteen years, despite the permissive statutory language, no harness licensee had ever sought the Commission's approval to import the signal of an out-of-state thoroughbred race. Neither had a thoroughbred licensee sought approval to simulcast an out-of-state harness race. A few months ago, however, Bally's Maryland, Inc., the new owner of the Ocean Downs harness track, applied for permission to open an off-track betting facility in Hagerstown. Bally's seeks permission to conduct in its facilities the simulcast of any out-of-state race that it desires, be it thoroughbred or harness. This request from Bally's represents a marked departure from past practice, under which thoroughbred interests in Maryland largely benefitted from the proceeds of interstate thoroughbred simulcasting. The loss of this revenue would likely have a significantly harmful impact on thoroughbred racing in Maryland.
In interpreting a statute, however, we are constrained by the governing principles of statutory construction, which direct us not to the novelty of a statute's application but to the language of the statute itself. "Ordinarily, where that language is clear, our probe for legislative intent begins and ends." Board ofCounty Commissioners v. Bell Atlantic-Maryland, Inc., 346 Md. 160,169, 695 A.2d 171 (1997). Through interpretation, we cannot add a restriction on interstate simulcasting that the General Assembly did not enact, however much we may think the General Assemblywould have done so if it had focused squarely on this issue.
The present situation calls for the Racing Commission to exercise its plenary authority over cross-breed simulcasting so as to promote the interests of horse racing as a whole. In our view, the Commission should not allow a harness track the unfettered privilege to simulcast directly out- of-state thoroughbred racing, at least until the issue is presented and addressed by the General Assembly. As we explain below, the required approvals for interstate simulcasting under BR, § 11- 804, as well as the disposition of betting proceeds, are quite inconsistent with legislative policy decisions applicable to intrastate simulcasting. Moreover, from our understanding of the situation, unrestricted cross-breed simulcasting would pose a great risk to the financial underpinnings of thoroughbred racing in Maryland. The General Assembly, not the Commission, is the right forum for these fundamental economic and policy issues to be debated and resolved.
 I Principles of Statutory Construction
It is a cliche that "the cardinal rule of statutory construction is to effectuate the intent of [the] legislature."State v. Ghajari, 346 Md. 101, 115, 695 A.2d 143 (1997). Yet, although "our principal aim is to effectuate the intent of the Legislature, . . . in order to do so, our first resort must be to the language of the statute itself." Bell Atlantic,346 Md. at 170. To be sure, interpreters of statutory text should not be blind to context, for statutory construction in Maryland seeks to prevent the General Assembly's drafting imperfections from defeating its legislative objective. Ambiguous text, for example, should be read to conform to the evident legislative objective. Even unambiguous text can be avoided if the language is patently a drafting mistake.Kaczorowski v. City of Baltimore, 309 Md. 505, 525 A.2d 628 (1987); 82 Opinions of the Attorney General ___ (1997) [Opinion No. 97-011 (May 1, 1997)].
What interpreters may not do is alter the evident meaning of the text or insert unexpressed provisions, on the theory that, had the General Assembly considered an issue, it would have drafted the law differently. Less than a year after Kaczorowski, the case that emphasized the quest for legislative intent, the Court of Appeals wrote this: "We look to the statute itself as the primary source of legislative intent. A corollary to this rule is that when the language of a statute is clear and unambiguous, courts may not insert or omit words to make a statute express intentions not evident in its original form." State v. In re Patrick A.,312 Md. 482, 487, 540 A.2d 810 (1988) (citation omitted). See also,e.g. In re Adoption No. A91-71A, 334 Md. 538, 566, 640 A.2d 1085
(1994) ("where the language of a statute is clear and unambiguous, we will not add words to reflect an intent not evidenced by that language").[2] Under this test, absent any clear indication from the legislative history of a drafting mistake — and we have found none in this case — the unambiguous language of BR, § 11-804(b) governs.
 II Interstate Simulcasting — Statutory Text
BR, § 11-804(b) provides as follows: "If the Commission approves, a licensee may contract to hold pari-mutuel betting on a race that is held at an out-of-state track where betting on racing is lawful." This subsection, like the rest of the section, is subject to an express statement of legislative intent: "The intent of this section is similar to that of the Interstate Horse Racing Act of 1978, 15 U.S.C. §§ 3001 through 3007." BR, § 11-804(a).
Nothing in BR, § 11-804 provides guidance to the Commission about the factors that it is to consider when it is asked to approve this kind of contract. The section does provide, however, for an additional approval: "A contract with an out-of-state track under this section is subject to the approval of the group that represents a majority of the owners and trainers who race horses at that track and the group that represents a majority of the applicable breeders in this State." BR, § 11-804(e).
Other provisions of BR, § 11-804 deal with the time and place of betting on out-of-state races and the allocation of the proceeds of the betting. Specifically, BR, § 11-804(c) provides that betting may only occur:
 (1) on a racing day when the Commission has authorized the licensee to hold racing; and
(2)(i) at the track of the licensee;
 (ii) at any track where pari-mutuel betting on races on the racing program of the licensee for that day is authorized; or
(iii) at a satellite simulcast facility.
Regarding the allocation of betting proceeds, BR, § 11-804(d) provides that the "breakage and takeout for pari-mutuel betting under this section shall be computed in the way normally applicable to pari-mutuel betting on racing the licensee holds."[3] Under BR, § 11-804(d)(2), the race track is to deduct State tax, "the amount to be paid under the contract to the out-of-state track," and "the cost of transmission."
The language of BR, § 11-804(b) is unambiguous. The term "a licensee," without modification, is used throughout BR Title 11, Subtitle 8 to mean any licensee. See, e.g., BR, § 11-801 ("The Commission may authorize a licensee to hold racing with pari-mutuel betting.") and 11-802(a) ("A licensee may not lend or give money to a person for pari-mutual betting."). Other provisions of this subtitle explicitly legislate distinctions between licensees. See, e.g., BR, § 11-811(b) ("The Commission may authorize inter-track betting between tracks of mile thoroughbred racing and harness racing licensees.") and 11-812(a) ("A mile thoroughbred racing licensee operating a sending track shall pay to the Commission [a refund of certain impact aid]."). The definition of "licensee" does not itself differentiate between thoroughbred and harness tracks, for it simply means "a person who has been awarded racing days for the current calender year." BR, § 11-101(h).
Nor does any other terminology in BR, § 11-804(b) imply a prohibition against interstate cross-breed simulcasting. Although the term "race" is not defined, it is evidently a single instance of "racing," which is defined to include all of the forms of racing permitted in Maryland.[4] Hence, the text unambiguously grants authority for any licensee, thoroughbred or harness, to simulcast any out-of-state race, thoroughbred or harness, if the Commission approves.
The cryptic reference to federal law in BR, § 11-804(a) — "the intent of this section is similar to that of the Interstate Horse Racing Act of 1978 . . ." — does not incorporate a prohibition on cross-breed simulcasting not otherwise expressed in the statutory text. The relevant statement of policy in the federal Act is that Congress determined "to regulate interstate . . . wagering on horse racing, in order to further the horse racing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b). Yet, it was also Congress' policy to preserve for the states "the primary responsibility for determining what forms of gambling may legally take place within their borders. . . ."15 U.S.C. § 3001(a)(1). If a state allows interstate off-track betting, the federal Act imposes requirements designed to protect the live product, namely the consent of the horsemen at the track where the live races run and, if a track is operated within 60 miles of an off-track betting facility, the approval of that track. See15 U.S.C. § 3004. As a federal appellate court summarized Congress' intent:
 Although the bills first introduced in Congress sought to eliminate interstate off-track wagering in its entirety, Congress soon recognized that horse racing and off-track wagering could coexist if regulated. Congress therefore opted for the compromise found at 15 U.S.C. § 3004(a) which allows interstate off-track wagering if, and only if, the interested parties consent.
Kentucky Division, Horsemen's Benevolent and Protective Ass'n,Inc. v. Turfway Park Racing Ass'n, Inc., 20 F.3d 1406, 1414 (6th Cir. 1994).
Nothing in the federal Act or its legislative history suggests that Congress had any special concern about interstatecross-breed simulcasting or intended any particular restriction on that form of off-track wagering. Therefore, the reference in BR, § 11-804(a) to a similarity of intent to that of the federal Act does not indirectly incorporate any restriction on interstate cross-breed simulcasting. This statement of intent does support the authority of the Racing Commission, however, to deny approval of cross-breed simulcasting if allowing it would affect the live product adversely or detrimentally alter the relationship among harness and thoroughbred interests in Maryland.
 III Interstate Simulcasting — Original Enactment in 1983
We have considered whether the legislative history of the original version of BR, § 11-804 evidences a legislative objective erroneously omitted from the text. There is no evidence of a drafting error of this kind.
Senate Bill 705 of 1983, according to its title, was for the purpose of "authorizing, under certain conditions, pari-mutuel wagering in this State on horse races conducted outside of this State. . . ." The pertinent language was this, enacted as Chapter 150 of the Laws of Maryland 1983 and codified at former Article 78A, § 31(a): "An association licensed to conduct racing in this State, with the approval of the Racing Commission, may contract to conduct pari-mutuel wagering on horse races of national or local significance held at race tracks in other states or countries where the conduct of racing and wagering is permitted by law."[5] Thus, in its original form, the statutory text was no more restrictive of cross-breed simulcasting than is the current text.
The General Assembly may have assumed, however, that it was legislating about thoroughbred simulcasting only. A Senate committee document describes the bill's background as follows: "Last year, approximately 15 race tracks simulcast the Preakness and experienced a significant increase in handle. Some of the races that would possibly be simulcast are: the Derby, the Belmont Stakes, the Travers Stakes and the Marlboro Cup." All of these are thoroughbred races. Likewise, in its description of the law at the time, the bill summary stated that, "Currently Maryland races can be broadcast in other states but races from other states such as the Kentucky Derby, for example, cannot be broadcast at a Maryland track so that racing patrons can bet on that race also." Moreover, at the bill hearing on Senate Bill 705, all of the witnesses from the horse racing industry represented thoroughbred interests. Had the harness segment of the industry recognized that the bill afforded them an opportunity to broadcast major thoroughbred races, one might have anticipated their supporting the bill, just as the thoroughbred interests did.
These items of legislative history imply a legislative assumption about the 1983 enactment: that it only addressed simulcasting of out-of-state thoroughbred races by thoroughbred tracks. Nevertheless, an assumption is not the law. No evidence in the legislative history suggests that the General Assembly had formed an intent, contrary to the enacted text, to allow thoroughbred licensees to simulcast out-of-state thoroughbred races, harness licensees to simulcast out-of-state harness races, but to prohibit cross-breed simulcasting. Nothing supports the supposition that the text, in its omission of restrictions, reflects a drafting error.
A more plausible supposition is that the 1983 General Assembly simply formed no intent, one way or the other, about cross-breed simulcasting, because that form of wagering had not happened and was not foreseen. As we wrote in a 1988 bill review letter, "[former] Article 78B, § 31 permits licensed associations to conduct wagering on horse races of national or local significance simulcast from race tracks outside the State. Whileno limitations are placed on the types of horse races to besimulcast, traditionally thoroughbred tracks take simulcasts of thoroughbred races and harness tracks take simulcasts of harness races." Bill Review Letter on Senate Bill 403 of 1988, at 2 (April 22, 1988) (emphasis added).
It may well be that, had the General Assembly contemplated the possibility of interstate cross-breed simulcasting, it would have disallowed it. Thoroughbred racing, after all, was for many years the only kind of racing on which betting was allowed in Maryland. See Chapter 273, Laws of Maryland 1920. When the General Assembly first authorized a racing association to hold harness racing in Maryland, it enacted a separate set of statutory provisions. See Chapter 408, Laws of Maryland 1937.[6]
Indeed, at the time of the 1983 legislation, the Racing Commission comprised two separate boards, one to license and regulate thoroughbred racing (the Thoroughbred Racing Board) and one to license and regulate harness racing (the Harness Racing Board).See Chapter 728, Laws of Maryland 1977 (repealed by Chapter 500, Laws of Maryland 1984). In addition, the General Assembly has separately regulated the flow of money to the thoroughbred and harness segments of the industry. In 1983, and today, the proceeds of betting are allocated in various ways to the racing associations, the horsemen, and the breeders. Separate statutory provisions apply to this allocation in the two segments of the industry, and there are some differences. Compare BR, § 11-515 with
BR, § 11-613 through 11-618. Many would deem it inconsistent with this scheme for betting revenues attributable to a thoroughbred race, albeit one emanating from out-of-state, to benefit only the harness segment of the industry.
These contextual factors — the sharp delineation between thoroughbred and harness racing — would likely have caused us to interpret any ambiguous language in the 1983 enactment toward a prohibition of cross-breed simulcasting. But there is no ambiguous language in the statute, and we cannot, with the power of hindsight, correct the General Assembly's decision to enact a broad authorization for out-of-state simulcasting that probably would have been worded differently had the General Assembly foreseen the issue now presented.
 IV Subsequent Legislation
We have also considered whether any of the General Assembly's subsequent simulcasting legislation evidences a decision to prohibit interstate cross-breed simulcasting. "Where the statute to be construed is a part of a statutory scheme, the legislative intention is not determined from that statute alone, rather it is to be discerned by considering it in light of the statutory scheme. When, in that scheme, two statutes, enacted at different times and not referring to each other, address the same subject, they must be read together . . . and harmonized, to the extent possible, both with each other and with other provisions of the statutory scheme." Government Employees Ins. Co. v. InsuranceCommissioner, 332 Md. 124, 132, 630 A.2d 713 (1993) (citations omitted).
A. 1988 Legislation 1. Chapter 7
The first of three simulcasting bills enacted in 1988 was an emergency bill, introduced as Senate Bill 88 and effective on February 29, 1988. In this bill, the General Assembly resolved a controversy about the Racing Commission's authority to establish a system under which patrons at Laurel Race Course could bet on races run at Pimlico. See 72 Opinions of the Attorney General 307 (1987). Given this background, Chapter 7 understandably was limited to intrastate (or "inter-track") wagering between thoroughbred tracks. See former Article 78B, § 12. Chapter 7 did not amend the 1983 law on interstate simulcasting, nor does its legislative history discuss that prior law.
 2. Chapter 9
Approximately one month later, a second simulcasting bill, Senate Bill 775, was enacted on an emergency basis. Unlike the earlier emergency bill, Senate Bill 775 dealt with an aspect of interstate simulcasting — namely, in the words of the bill's short title, "intrastate wagering on interstate simulcasting." As introduced, Senate Bill 775 would have amended former Article 78B, § 31 (the 1983 enactment) to allow the thoroughbred tracks that had just been authorized by Chapter 7 to engage in intrastate simulcasting to use the new authority to "inter-track" out-of-state races as well. In other words, if Pimlico imported the signal for an out-of-state race, it could send the signal to Laurel, assuming that the approvals required by Chapter 7 were obtained. Since the bill was merely an amplification of the earlier legislation, itself limited to thoroughbred tracks, and dealt only with "intrastate wagering on interstate simulcasting," the bill did not alter the authority racetracks had, as a result of the 1983 enactment, to engage in interstate simulcasting when the signal came directly to their own facilities.
One piece of the legislative history of Chapter 9 does reflect, for the first time, legislative awareness that harness tracks might engage in simulcasting out-of-state races. As introduced, the bill would have amended former Article 78B, § 31(b) to limit wagering under § 31 to "within the confines of the licensee's thoroughbred horse race track," except for the thoroughbred tracks authorized by Chapter 7 to engage in intrastate simulcasting. The word "thoroughbred" was deleted by amendment. The Senate committee's bill summary characterized the amendment as "technical, striking the word `thoroughbred' insofar as it conflicts with current law pertaining to the authority of trotting and pacing licensees to conduct wagering on certain horse races of national or local significance held at tracks outside of the State." This language does not clarify whether the "certain horse races of national or local significance held at tracks outside of the State" were themselves thoroughbred or harness races. Further, since the bill was characterized in the summary as "expand[ing] the existing authority of licensed horse race tracks to conduct pari-mutuel wagering on out-of-state horse races to include in-state receiving tracks who are authorized to conduct inter-track wagering," the amendment is not evidence of a legislative intent to limit the scope of the 1983 enactment.[7]
 3. Chapter 305
The third simulcasting bill of 1988 concerned, in the words of the bill's short title, "intrastate simulcasting." Senate Bill 403, enacted as Chapter 305 and codified at former Article 78B, § 30, authorized the Racing Commission "to issue to a certain harness race track an intrastate simulcast license that permits inter-track wagering during certain periods of time and under certain terms and conditions, on races conducted at certain thoroughbred racetracks." The track in question was Delmarva Downs, and the objective of the legislation, according to a Senate committee document, was to "modestly expan[d]" the authority granted under Chapter 7 for inter-track wagering on thoroughbred races "to include one harness track in the state. The intent is to provide Delmarva Downs harness track with an additional attraction to encourage attendance at the track during the summer season at Ocean City." The approval of all interested parties was required. See former Article 78B, § 30(c).
There is no indication in the legislative history of Chapter 305 that the General Assembly considered the relationship between this limited authorization of cross-breed simulcasting from one Maryland track to another and the 1983 provision on simulcasting from an out-of-state track to a Maryland track. Instead, the legislative focus, as evidenced by the requirement for approval from the horsemen at the thoroughbred track, was on protecting live racing in Maryland. Thus, the committee document summarized the bill as authorizing "inter-track wagering to take place at Delmarva Downs harness track on thoroughbred horse races simulcastlive from Pimlico or Laurel Race Track." (Emphasis added.)
 4. Summary of 1988 Legislation
Our overall analysis of the three 1988 simulcasting bills is that they neither clarify nor alter the 1983 enactment allowing interstate simulcasting without a "same breed" limitation. Two of the three 1988 bills, Chapters 7 and 305, were exclusively concerned with the simulcasting of a race run in Maryland to another track in Maryland. The third bill, Chapter 9, is more pertinent, both because it amended the 1983 law and restricted to thoroughbred tracks the intrastate simulcasting of out-of-state races. On the face of it, it is puzzling that the General Assembly did not authorize a harness track to obtain a simulcast of an out-of-state thoroughbred race by means of an "inter-tracked" signal from Pimlico or Laurel but did authorize the harness track to obtain the simulcast directly from the out-of-state track.[8] We have no good explanation of this anomaly, except that the General Assembly was unaware of it understandably, because no harness track had ever tried to import directly the signal of an out-of-state thoroughbred race. The existence of the anomaly, however, is not a sufficient basis for us to engraft onto the 1983 enactment an unexpressed prohibition on interstate cross-breed simulcasting.
B. 1990 Legislation
Chapter 102 of the Laws of Maryland 1990, introduced as Senate Bill 318 and codified as an amendment to former Article 78B, § 30 expanded the scope of intrastate cross-breed simulcasting. As a committee document explained, the bill "expands intertrack wagering authorization to Rosecroft, and allows any track, with one exception, to either send or receive simulcast broadcasts. The exception is Pimlico, which is prohibited under the bill from receiving simulcast harness events which generally take place in the evening. The residents around Pimlico Race Track did not want evening activity at the track."
As was the case with the 1988 Delmarva Downs legislation, this bill's focus was on live racing in Maryland. Under former Article 78B, § 30(a)(4), "intrastate simulcast horse races" were "horse races conducted at a sending track, transmitted simultaneously by video signal to a receiving track." The 1990 legislation contained the same set of approvals as in the earlier legislation and the same allocation of betting proceeds to the track where the race was actually run. It also required tracks that wanted to receive intrastate simulcasts to run a minimum number of live racing days.
The 1990 legislation thus exacerbated the anomaly that we discussed above. If a harness track wanted to simulcast a race run at Laurel or Pimlico, it could do so only after obtaining approvals from both thoroughbred and harness interests, and it would have to remit the betting proceeds to the thoroughbred track. On the other hand, the harness track could arrange with an out-of-state thoroughbred track to simulcast its races directly, obtaining only the more limited approvals required by the federal Act and treating the betting proceeds as if they were the proceeds of betting on a harness race. This anomaly is cause for concern and careful regulatory attention. It is not, however, sufficient for us to add a restriction to the 1983 enactment that was not adopted by the General Assembly.
C. 1992 Legislation 1. Chapter 4
Chapter 4 was the Code Revision bill to enact the Business Regulations Article. The Revisor drafted the new definition of "intertrack betting," BR, § 11-101(f), to mean "betting on a race that is . . . held live or by interstate simulcast at a sending track in the State." The emphasized language, the Revisor explained, was "added to reflect the practice of a sending track that receives a simulcast of an out-of-state race and relays the simulcast to a receiving track." Revisor's Note to BR, § 11-101(f). The effect was to expand the scope of cross-breed simulcasting from one Maryland track to another. The prior legislation, Chapters 305 of 1988 and 102 of 1990, only allowed the intrastate simulcasting of races run at Maryland tracks; BR, § 11-811(b), which allows the Commission to "authorize intertrack betting between tracks of mile thoroughbred racing and harness racing licensees," includes intertrack betting on out-of-state races simulcast at the sending track.
Chapter 4, however, did not alter the scope of the prior authorization for direct importation of the signal of an out-of-state race. The Revisor's Note to BR, § 11-804 describes it as "new language derived without substantive change from former Art. 78B, § 31."
 3. Chapter 473
Chapter 473, introduced as Senate Bill 392, greatly expanded simulcasting in the State by providing for off-track betting (termed "satellite simulcast betting"). These off-track betting provisions are now codified at BR, § 11-815 through 11-832.
Included in Chapter 473 was an amendment to the interstate simulcasting law, eliminating the restriction that had limited the intrastate simulcasting of out-of-state races to thoroughbred tracks.[9] This change was accomplished by simply eliminating the word "thoroughbred" that had been added by the 1988 law, Chapter 9, on the intrastate simulcasting of out-of-state races. After the amendment, former Article 78B, § 31 read, in pertinent part as follows:
 (a) An association licensed to conduct racing in this State, with the approval of the Racing Commission, may contract to conduct pari-mutuel wagering on horse races held at race tracks in other states or countries where the conduct of racing and wagering is permitted by law.
(b) Any wagering made under this section shall take place:
 (1)(i) within the confines of the licensee's horse race track,
 (ii) at any horse race track authorized to conduct wagering on horse races on the licensee's racing program for that day, or
(iii) at a satellite simulcast facility; and
 (2) on a day for which the Commission has authorized the licensee to conduct racing.
There is no hint in the legislative history that this dramatic expansion of simulcast wagering was itself intended to limit interstate cross-breed simulcasting. To the contrary, a Senate committee summary of the bill describes the objective in the broadest terms: "Current law requires that out-of-state simulcasts (to Maryland tracks) be of races of national or local significance with a purse in excess of $50,000. This bill would delete this requirement and allow out-of-state simulcasts to Maryland tracks for pari-mutuel wagering on any race from any
out-of-state track that is authorized by law to conduct pari-mutuel wagering." (Emphasis added.) Further, the fiscal note for the bill described it as allowing "any racing licensee to conduct pari-mutuel wagering on any horse race in another state or country." (Emphasis added.) The fiscal note likewise noted that an "off-track betting facility in downtown Philadelphia takes races from both thoroughbred and harness tracks." The fiscal note, in calculating projected State revenues, evidently assumed that off-track betting facilities would have the same broad range of offerings.
 V Racing Commission Review
A. Prior Administrative Practice
The Racing Commission has never addressed the meaning of BR, § 11-804(b) in a regulation or other formal interpretation. The only evidence of administrative practice is the Commission's acquiescence in an arrangement between thoroughbred and harness tracks called a "Facilities Use Agreement."
In a 1993 advice letter, counsel to the Racing Commission concluded that BR, § 11-504, which prohibited thoroughbred licensees from holding racing after 6:15 p.m., was applicable not only to the holding of live racing but also to the simulcasting of races from out-of-state. In an effort to deal with this restriction, the racing associations licensed to hold mile thoroughbred racing (Pimlico and Laurel) and the racing associations licensed to hold harness racing (Rosecroft and Ocean Downs) entered into a "Facilities Use Agreement." Although the specific terms of this agreement were modified on several occasions, its basic premise was to enable both the thoroughbred and harness tracks to conduct betting on thoroughbred races simulcast from out-of-state by avoiding the time restriction of BR, § 11-504. This was accomplished by placing the harness track's personnel at the thoroughbred track to "use" the facility to hold this racing and by characterizing the harness track as "holding" the simulcasting of thoroughbred racing after 6:15 p.m., rather than the thoroughbred track.[10] This device was furthered by the harness track's then, ostensibly, "sending" the out-of-state signal to the thoroughbred track under the auspices of the inter-track betting statute, BR, § 11-811. As a result, both the thoroughbred tracks and the harness tracks were able to conduct pari-mutuel betting on out-of-state thoroughbred races after 6:15 p.m. The betting proceeds were divided between the respective thoroughbred and harness entities pursuant to the negotiated terms of the Facilities Use Agreement.
To eliminate the need for these agreements, Senate Bill 557 of 1997 was passed on an emergency basis (Chapter 747, Laws of Maryland 1997), effective May 22, 1997. This law entitles a thoroughbred track to hold betting on simulcast races after 6:15 p.m., but only with the consent of the "nearest" harness track, as well as the groups that represent the horsemen who race at that track and the standardbred breeders in the State. The prohibition on a thoroughbred track's conducting live racing after 6:15 p.m. remains in place.
B. The Commission's Approval Authority
BR, § 11-804(b) gives plenary authority to the Racing Commission to decide whether to approve a contract for interstate simulcasting. Of course, the Commission may not withhold its approval for a reason that the courts would find to be arbitrary and capricious. See, e.g., Mahoney v. Byers, 187 Md. 81,48 A.2d 600 (1946); Brann v. Mahoney, 187 Md. 89, 48 A.2d 605 (1946). Nevertheless, the General Assembly has invested the Racing Commission with very broad discretion to act in the best interests of racing. BR, § 11-209. See generally Lussier v. Maryland RacingCommission, 343 Md. 681, 684 A.2d 804 (1996).
The Commission may, and should, use its authority to scrutinize with the greatest care arrangements for interstate simulcasting that are not subject to the legislative restrictions applicable to intrastate simulcasting. Earlier in this opinion, we described as "an anomaly" the fact that a harness track can avoid State law requirements about interested parties' approval, allocation of betting proceeds, and live racing by simply contracting directly with an out-of-state thoroughbred track. Suppose, for example, that Laurel imports the signal of a race from Hollywood Park. If Ocean Downs wants to simulcast the race by obtaining it from Laurel, Ocean Downs must obtain the approval, among others, of the horsemen at Laurel and the thoroughbred breeders in the State. Moreover, the revenues from betting on that race would benefit Laurel and the thoroughbred horsemen and breeders. If, however, Ocean Downs simply contracted with Hollywood Park to simulcast the race itself, it need not obtain the approval of any Maryland thoroughbred interest, and the betting proceeds would benefit Ocean Downs and harness interests. As we have explained, there is no evidence that the General Assembly ever considered this anomaly, but the Racing Commission must.
In any event, the Commission should not approve any application for out-of-state cross-breed simulcasting if the race involves a breed of horse not authorized for horse racing in Maryland. In 72 Opinions of the Attorney General 313 (1987), we concluded that, under the law at the time, the Racing Commission had authority to license types of racing other than those specifically identified in the Horse Racing Act. In its next session, the General Assembly reacted to our opinion by changing the law. See Chapter 7 (Senate Bill 88) of the Laws of Maryland 1988. Under what is now BR, § 11-210(b)(1), the Commission is prohibited from adopting regulations that would allow "racing a breed of horse not now authorized by law." Moreover, when the Commission issues a license for racing days at a race meeting, the Commission must specify "the kind of racing to be held." BR, § 11-304(n)(3). "Racing," as we have previously noted, is limited by statute to specified kinds. BR, § 11-101(o).[11] The Commission would abuse its discretion, in our opinion, if it circumvented these restrictions through the approval of contracts for the simulcasting of out-of-state races involving breeds other than those authorized by law to race in Maryland.
 VI Conclusion
The issue of cross-breed simulcasting of out-of-state races is a most difficult one, for it requires application of a statute that was not written with this issue in mind. But the principles of statutory construction require us to take the law as it is, not as we think it might have been had the General Assembly focused on this issue. Therefore, until the General Assembly revisits the matter, we advise that current law does not prohibit interstate cross-breed simulcasting. In exercising its supervisory power, however, the Racing Commission should give the General Assembly the opportunity to do just that. The Commission should not grant broad or unrestricted approval of cross-breed simulcasting, pending consideration of the issue in the next session of the General Assembly.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions and Advice
[1] If interstate cross-breed simulcasting is legal, you also ask whether it is limited to a breed or type of racing authorized under the Maryland Horse Racing Act. For the reasons explained at the end of Part VB below, it is so limited.
[2] In Kaczorowski itself, the Court of Appeals disavowed the notion "that a court is wholly free to rewrite a statute merely because of some judicial notion of legislative purpose."309 Md. at 516 n. 4.
[3] "Breakage" is defined as "the odd cents that remain after all successful bettors are paid to the next lowest multiple of 10 cents." BR, § 11-101(b). "Takeout" is defined as "the part of the handle [the gross amount, less refunds, of money bet] that is not returned to successful bettors but is otherwise allocated under this title." BR, § 11-101(t).
[4] BR, § 11-101(o) defines "racing" as including:
(1) harness racing;
(2) mile thoroughbred racing;
(3) special thoroughbred racing;
(4) steeplechase or hurdle racing;
(5) flat racing; and
(6) quarter horse racing.
[5] The provision about the federal Act was phrased this way: "The provisions of the federal Interstate Horse Racing Act of 1978, Title 15, Sections 3001 through 3007, U.S. Code, shall be instructive regarding the intent of this section." Former Article 78B, § 31(e).
[6] Under current law, thoroughbred racing is the subject of BR Title 11, Subtitle 5; harness racing, of BR Title 11, Subtitle 6.
[7] Chapter 9 did limit the scope of the 1983 enactment in one way: To the prior criterion that the out-of-state race be of "national or local significance," Chapter 9 added the requirement that the purse for the race be at least $50,000.
[8] The "inter-tracking" of a simulcast of an out-of-state race was limited to thoroughbred tracks. The Delmarva Downs legislation only allowed inter-tracking of Maryland thoroughbred races. See former Article 78B, § 30(a)(4).
[9] This amendment also removed the requirement that interstate simulcasting be limited to races of local or national significance for a purse of at least $50,000. As a result, an entire program of out-of-state racing could be simulcast.
[10] A review of the contracts between the Maryland racing associations and the out-of-state tracks reveals that the signatories to these contracts were not the harness racing associations, but, instead, the thoroughbred racing associations themselves.
[11] See note 4 above. If the Commission identifies one kind of racing on the license but later approves a contract for cross-breed simulcasting, the later approval amounts to a modification of the license.
 *Page 149