Dear Commissioner Larsen:
You have requested our opinion on the circumstances under which a member of a health maintenance organization ("HMO") may be billed by a health care provider for amounts in excess of the reimbursement paid to the provider by the member's HMO. This practice, known as "balance billing," is affected by several provisions of the Health-General ("HG") Article, Maryland Code. Specifically, you seek guidance on the applicability of these provisions to providers in Maryland, both those who are under contract with an HMO and those who are not. You also ask whether these provisions apply to an out-of-state practitioner or facility that provides services to a Maryland member of an HMO.
Our opinion is as follows:
1. A provider under contract with an HMO may not balance bill a member for any covered service. The provider may bill the member directly, however, for any non-covered service.
2. Except in the case of a point-of-service HMO policy, a non-contracting provider who provides a covered service to an HMO member may not balance bill the member. If the member is covered under a point-of-service HMO policy and the member's contract contains a cost-sharing provision authorizing balance billing, a non-contracting provider may balance bill the member. In all cases, a non-contracting provider may directly bill an HMO member for any non-covered service.
3. The provisions of Maryland law relating to balance billing apply to out-of-state practitioners and facilities to the fullest extent permitted by the United States Constitution. They do not apply to an out-of-state practitioner or facility that is not under contract with an HMO and does not otherwise have the necessary minimum contacts with the State to be governed by Maryland law.
 I In-State Providers
A. Introduction
Maryland's original HMO statute did not address whether an HMO member could be liable to a provider for any portion of the cost of medical care provided. See Chapter 276, Laws of Maryland 1975. From 1988 through 1995, however, the General Assembly enacted a number of provisions to identify various instances in which a member could be billed by a provider when that provider, whether in- or out-of-network, had not been fully reimbursed by the HMO. This opinion considers the effect of each.
B. 1988: Balance Billing by Contracting Providers Prohibited
In 1988, the General Assembly adopted the "hold harmless" clause now contained in HG, § 19-710(h). See Chapter 754, Laws of Maryland 1988. This section provides as follows:
 (1) The terms of the agreements between a health maintenance organization and providers of health services shall contain a "hold harmless" clause.
 (2) The hold harmless clause shall provide that the provider may not, under any circumstances . . . bill, charge, collect a deposit, seek compensation, remuneration, or reimbursement from, or have any recourse against the subscriber, member, enrollee, patient, or any persons other than the health maintenance organization acting on their behalf, for services provided in accordance with the provider contract.
 (3) Collection from the subscriber or member of copayments or supplemental charges in accordance with the terms of the subscriber's contract with the health maintenance organization, or charges for services not covered under the subscriber's contract, may be excluded from the hold harmless clause.
This statute applies only to "agreements between a HMO and providers of health services." The clear purpose and effect of HG, § 19-710(h) is to ensure that subscribers would not be held liable for any covered service rendered by providers who were under contract with the HMO. This statute does not, however, address in any fashion the obligation of subscribers to non-contracting providers.
C. 1989: Balance Billing Generally Prohibited
In Chapter 610 (Senate Bill 758) of the Laws of Maryland 1989, the General Assembly enacted HG, § 19-710(o), with the purpose of extending the "hold harmless" concept to all providers, whether or not the provider was under contract with the HMO. The purpose clause of Senate Bill 758 provided simply that the bill was for the purpose of "specifying that enrollees or subscribers of health maintenance organizations be held harmless for certain financial obligations of health maintenance organizations. . . ." The Floor Report for Senate Bill 758 elaborated: "Individual enrollees and subscribers shall not be liable to any provider for covered services. The provider may collect copayment or coinsurance sums from an enrollee for covered services and may collect all charges for services not covered under the subscriber's contract."
In exceptionally broad language, the General Assembly gave subscribers immunity from liability for the cost of "covered services":
 (o)(1) Except as provided in paragraph (3) of this subsection, individual enrollees and subscribers of health maintenance organizations issued certificates of authority to operate in this State shall not be liable to any health care provider for any covered services provided to the enrollee or subscriber.
Providers also were barred from efforts to collect from subscribers money owed to providers by HMOs. HG, § 19-710(o)(2). The General Assembly, at that time, made only two exceptions to these immunity provisions:
 (3) Notwithstanding any other provision of this subsection, a health care provider or representative of a health care provider may collect or attempt to collect from a subscriber or enrollee:
 (i) Any copayment or coinsurance sums owed by the subscriber or enrollee to a health maintenance organization issued a certificate of authority to operate in this State for covered services provided by the health care provider; or
 (ii) Any payment or charges for services not covered under the subscriber's contract.
The General Assembly thus rendered HMO subscribers immune from liability from actions by "any health care provider for any covered service." Under HG, § 19-710(o), the provider may not collect from the subscriber any money owed it by the HMO and may not maintain an action against the subscriber, provided the service was a covered service.
HG, § 19-710(o)(3) does permit any provider, in- or out-of-network, to directly collect from a subscriber copayments or coinsurance. Furthermore, all providers could continue to direct bill for non-covered services. So, for example, if a primary care provider in an HMO declines to authorize a speciality service, but the HMO subscriber chooses to obtain the service anyway, the specialist may directly bill the subscriber for that service.
To summarize, after the 1989 enactment HG, § 19-710 had the following consequences:
 (1) No provider, whether under contract with the HMO or not, could charge an HMO subscriber for any treatment which was a covered service;
 (2) both contracting and non-contracting providers could charge copayments and deductibles as set forth in the HMO contract for covered services; and
 (3) for non-covered services, all providers could directly charge the subscriber.
D. 1991: Increasing Non-Contracting Providers' Reimbursement
One consequence of the stringent limits on balance billing was that HMOs commonly paid less than a non-contracting provider's normally billed rate, despite the fact that the provider had not agreed to the lower contracting-provider rate. These providers could not recoup the difference from the patients themselves. As a result, non-contracting providers were apparently often unwilling to treat HMO members. In a March 5, 1991 letter to Chairman O'Reilly of the Senate Finance Committee, the Consumer Protection Division of the Attorney General's Office indicated that "late payment and processing of claims by HMOs is a significant problem for HMO members and referral providers alike. . . . Some providers have also suggested to us that they may no longer agree to provide services to HMO members, if this dilemma is not resolved. . . ." The letter continued, "The amendments . . . proposed by the Maryland Hospital Association address the problems which exist in the HMO-provider relationship, while maintaining the protection for patients established . . . two years ago."[1]
In Chapter 121 (Senate Bill 701) of the Laws of Maryland 1991, codified in HG, § 19-710.1, the General Assembly addressed payments by an HMO to out-of-network providers. For a covered service rendered by an out-of-network provider, this legislation mandated that the HMO must pay the provider within 30 days, that hospitals are to be paid at the rate approved by the Health Services Cost Review Commission, and that other providers are to be paid at the rate billed or at the "usual, customary, and reasonable" ("UCR") rate. HG, § 19-710.1(b). The HMO may seek reimbursement from the member for a payment made under subsection (b) that the HMO determines is the responsibility of the subscriber. HG, § 19-710.1(c). While HG, § 19-710.1 does result in potentially higher payments to non-contracting providers, it does not grant providers the authority to balance bill for covered services. It merely provides that out-of-network providers are paid for covered services by the HMO at the rate of the actual bill or at the UCR rate and may not seek further payment from the member directly. HG, § 19-710.1(b) and (c).
Thus, as of 1991, non-contracting providers were entitled to be paid promptly and at a higher rate but were still prohibited from balance billing or otherwise charging HMO members for covered services. All providers, of course, could still directly bill HMO members for non-covered services.
E. 1995: Point-of-Service Billing
Due to the continued prohibitions on "balance billing" by non-contracting providers and the concomitant reluctance of non-contracting physicians to treat HMO subscribers, in 1995 the General Assembly again addressed this issue. In order to allow greater patient choice but at the same time maintain the essential HMO structure, the General Assembly enacted HG, § 19-710.2. See
Chapter 605 (Senate Bill 449), Laws of Maryland 1995.
Referred to as the Patient Access Act, Senate Bill 449 was intended to address "two critical issues in the health care arena: (1) access to the doctor of your choice, ensuring quality care; and (2) fairness in the establishment of provider panels." See
Floor Report, Senate Bill 449. HG, § 19-710.2(b) provides that if an employer offers only an HMO plan to its employee, "the health maintenance organization with which the employer . . . is contracting for the coverage shall offer . . . a point-of-service option to the employer . . . as an additional benefit for an employee or individual, at the employee's or individual's option, to accept or reject."
A point-of-service plan allows subscribers to receive covered treatment by out-of-network providers without a prior referral or preauthorization from the HMO.[2] HG, § 19-710.2 requires HMOs to offer a point-of-service option in conjunction with traditional HMO plans. This section applies to contracts issued or renewed after January 1, 1996.
Allowing subscribers greater freedom to receive treatment from non-contracting providers, on a self-referral basis, unquestionably involves additional costs. As the bill analysis for Senate Bill 449 noted, "SB 449 recognizes the extra costs that can be associated with freer patient access to doctors." Therefore, the General Assembly provided as follows: "A carrier may impose different cost sharing provisions for the point-of-service option based on whether the service is provided through the provider panel of the health maintenance organization or outside the provider panel of the health maintenance organization." HG, § 19-710.2(c)(2).
By using the broad phrase "different cost sharing provisions," without further restrictions, the General Assembly evidently intended to allow an HMO latitude in determining how much of the cost of the out-of-network treatment would be borne by the subscriber. The bill summary for Senate Bill 449 identifies higher point-of-service premiums and deductibles and copayments as ways of recapturing the higher cost of the point-of-service option.
Thus, under the 1995 legislation, HMOs may require subscribers to pay the difference between the billed rate and any amount paid by the HMO, in addition to copayments, deductibles, and the like, on an out-of-network self-referred service. If the HMO contract so provides, the out-of-network provider may balance bill the subscriber for the difference between the UCR and the billed rate.[3] This permission to balance bill on point-of-service delivery systems is a narrow exception to the general and long-standing prohibition on balance billing.
 II Out-of-State Providers
You asked about the applicability of the provisions discussed in Part I to out-of-state practitioners or facilities that provide services to Maryland HMO members. While a literal reading of a key definition could be construed to limit the balance billing rules to Maryland licensees, such a reading would be inconsistent with other provisions of the HMO law and with the evident legislative purpose of the balance billing provisions. We conclude that the balance billing rules generally apply to out-of-state practitioners and facilities. Some out-of-state practitioners and facilities, however, do not possess sufficient minimum contacts with Maryland to permit the rules to be applied.
All of the balance billing statutes at issue are directed at "providers." For example, HG, § 19-710(h) refers to "providers of health services"; under HG, § 19-710(o) a member shall not be liable "to any health care provider"; HG, § 19-710.1 refers to a "health care provider, including a physician or hospital"; and HG, § 19-710.2 defines "provider panel" as "those providers with which a health maintenance organization contracts to provide services to the health maintenance organization members."
The term "provider" is defined in the HMO law as follows:
 "Provider" means any person, including a physician or hospital, who is licensed or otherwise authorized in this State to provide health care services.
HG, § 19-701(h). One interpretation of this definition would make licensure or a similar authorization by the State of Maryland the linchpin for application of the balance billing rules.[4]
Under this interpretation, the balance billing provisions would not apply to out-of-state providers unless they are also licensed to provide health care services in Maryland. When considered in the context of the HMO law as a whole, however, this construction of the term "provider" would lead to nonsensical results and cannot be sustained.
For example, HG, § 19-701(e) defines "health care services" as "services, medical equipment, and supplies that are provided by a provider." If the term "provider" did not include a physician licensed in other states, an HMO would not be permitted to contract with out-of-state physicians to make certain health care services available to its members. However, HMOs regularly contract with physician networks in the states bordering Maryland in order to make speciality care and other services available to their members.
Also, HG, § 19-710.2 defines "provider panel" as "those providers with which a health maintenance organization contracts to provide services" to its members. If, for example, an out-of-state physician were excluded from the definition of "provider" in the HMO law, an HMO would be unable to contract with that physician to provide services.
These examples illustrate the illogical consequences of adopting a narrow construction of this term. No one would suggest that the General Assembly, in defining the term "provider," as it did, intended to create a system of managed care in which the health care delivery system ended at the Maryland border, depriving many Maryland HMO members of the opportunity to obtain needed care close to their homes. When interpreting a statute, one may depart even from a plain meaning interpretation if the plain meaning would achieve an illogical or unreasonable result.Tucker v. Fireman's Funds Ins. Co., 308 Md. 69, 517 A.2d 730
(1986). Where, as here, a plain meaning interpretation of a word or phrase results in an illogical result:
 We may and often must consider other `external manifestation' or `persuasive evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us. . . .
Kaczorowski v. City of Baltimore, 309 Md. 505, 515, 525 A.2d 628,632-33 (1987).
The term "provider" appears in many places, defined with slightly varying language from one setting to the next. For example, in 1976, the General Assembly enacted provisions relating to health care malpractice claims. Section 3-2A-01(e) of the Courts and Judicial Proceedings Article defines "health care provider" as:
 [A] hospital, a related institution . . ., a physician, . . ., licensed or authorized to provide one or more health care services in Maryland. . . .
Since that time, the same or similar definition has appeared repeatedly in legislation defining the term "health care provider."
In 1989, as part of its legislation on AIDS, the General Assembly defined "health care provider" as "a physician, a physician's designee, or a designee of a health care facility licensed or otherwise authorized to provide health care services." HG, § 18-338(a). In 1993, in creating the Maryland Health Care Access and Cost Commission, the General Assembly defined "health care provider" in part as "a person who is licensed, certified, or otherwise authorized under the Health Occupations Article to provide health care in the ordinary course of business or practice of a profession or in an approved education or training program. . . ." HG, § 19-1501(d)(1)(i). Most recently, in 1997, when it created the Maryland Health Care Foundation, the General Assembly employed the same definition of "health care provider" in HG, § 20-502(c).
In none of these instances was there any indication that the Legislature intended to allow fine distinctions in the wording of a definition determine whether out-of-state practitioners or facilities would be included or excluded. Rather, the substance
of the statute and its underlying goals should guide that inquiry. In our view, it is unlikely that exclusion of out-of-state providers was specifically intended by the drafters of HG, § 19-701(h).
A narrow construction of the definition of "provider" in the HMO law would be inconsistent with the evident legislative purpose of that law. The balance billing provisions are primarily designed to protect Maryland consumers from unanticipated billings by physicians, hospitals, and other providers beyond the deductibles and co-payments enumerated in their policies. The hold harmless provisions force the provider and the HMO to resolve financial matters between them, without recourse to the member. The legislative purpose of the initial hold harmless protections established in 1988 and the later refinements would be at odds with a definition of "provider" that broadly excluded all out-of-state practitioners and facilities. There is no indication in the legislative history to any of the sections discussed above that the General Assembly believed it was addressing the issue of balance billing for a subset of Maryland citizens — i.e., those whose care was provided exclusively by Maryland-based physicians or hospitals. Rather, the legislation was directed at all HMO members and subscribers.
Thus, we conclude that out-of-state practitioners or facilities, even if not licensed in Maryland, are "providers" as contemplated by HG, § 19-701(h). Accordingly, those providers are subject to the balance billing rules in the HMO law.
We note that our conclusion that an out-of-state practitioner or facility is a "provider" for purposes of the balance billing rules may have constitutional implications. While the regulation of the business of insurance enjoys some protection from the broad prohibitions of the Commerce Clause, it is not similarly protected from the requirements of the Due Process Clause.[5] See 65Opinions of the Attorney General 266 (1980). The Due Process Clause requires that a person have certain minimum contacts with a state such that a state's regulation of the person does not "offend traditional notions of fair play and substantial justice."International Shoe Corp. v. Washington, 326 U.S. 311, 316
(1945).[6]
The minimum contacts analysis turns on whether the provider has continuous and systematic contact with Maryland residents or persons insured under a Maryland contract and whether the State has a sufficient interest in the protection of its residents to apply its law to a foreign person. Clearly, the General Assembly has expressed a strong interest in protecting the residents of Maryland from balance billing by any practitioner or facility. There is no indication in the legislative history of the balance billing provisions that the General Assembly believed it was binding only in-state providers. Rather, its efforts were aimed at protecting Maryland citizens from actions by any practitioner or facility.
An out-of-state provider who is under contract with a Maryland-licensed HMO has sufficient minimum contacts to justify application of the Maryland balance billing rules. That provider has chosen to be bound by a contract executed in Maryland under Maryland law and to provide health care services to the members of a Maryland-regulated HMO.[7] By contracting in Maryland to provide health care services, a provider from another state has sufficient minimum contacts with Maryland such that application of the balance billing laws does not offend due process.
On the other hand, an out-of-state provider who has not contracted with a Maryland-licensed HMO may have little contact with Maryland. For example, a doctor in another state who happens to treat a Maryland HMO member in that state may well not have the minimum contacts with Maryland required by the Due Process Clause to permit application of Maryland's balance billing provisions to that doctor. Obviously, the varying circumstances of particular providers may lead to different results under the Due Process Clause.
Therefore, we conclude as a matter of statutory interpretation that a non-Maryland licensed out-of-state practitioner or facility is a "provider" as defined in HG, § 19-701(h). However, the balance billing rules in the HMO law would only apply if that practitioner or facility is under contract with a Maryland-licensed HMO or has other sufficient minimum contacts with the State of Maryland to justify the application of Maryland law.
 III Conclusion
In summary, our opinion is as follows:
1. A contracting provider may not balance bill an HMO member for a covered service.
2. A non-contracting provider under a traditional HMO may not balance bill an HMO member but instead must accept the "usual, customary, and reasonable rate" paid by the HMO. A non-contracting provider may balance bill an HMO member only under a point-of-service HMO policy and only if the member's contract provides for such a cost-sharing provision.
3. All contracting and non-contracting providers may directly bill an HMO member for a non-covered service.
4. The rules relating to balance billing under Maryland law apply to an out-of-state provider unless that provider is not under contract with a Maryland-licensed HMO and does not otherwise have the minimum contacts with Maryland that would permit application of Maryland law to the provider.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Assistant Attorney General
 Ren L. Tundermann Assistant Attorney General
___________________ Robert N. McDonald Chief Counsel Opinions Advice
[1] To like effect was a subsequent letter sent to the HMO industry by the then Insurance Division of the Department of Licensing and Regulation: "Reducing benefits to non-contracting providers to the HMO negotiated rate is harmful to the health care of HMO members in the State of Maryland. Inasmuch as providers are prohibited by law from balance billing HMO members for HMO covered services, the Insurance Division is aware that this practice could cause providers who have not contracted with an HMO to refuse non-emergency care to HMO members." Letter of PhilipL. Wickenden, Associate Commissioner, Insurance Division ofDepartment of Licensing and Regulation (August 15, 1991).
[2] The term "covered services" includes services encompassed by the benefit package that are either provided by the HMO or provided by a non-contracting provider as authorized by the HMO. See HG, § 19-710.1(a)(3). Medical services provided under a point-of-service option are "authorized" by the HMO contract and are, therefore, "covered services."
[3] HG, § 19-710.2 does not mandate balance billing or any other cost-sharing arrangements. The statute merely allows an HMO to provide for appropriate cost-sharing in contracts. Thus, in all cases the contract would have to be consulted.
[4] Under this interpretation, the phrase "otherwise authorized" pertains only to categories of providers that are not licensed under State law, but instead operate under some other form of authorization. For example, the requirement that a physician be licensed under § 14-301 of the Health Occupations Article is subject to certain exceptions. HO, § 14-302 permits individuals such as supervised medical students or physicians licensed elsewhere who are consulting with a Maryland-licensed physician to practice medicine without a license. These types of individuals could be considered "otherwise authorized" as a provider under HG, § 19-701(h).
[5] The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." Article I, § 8, Cl. 3. In United States v. South-EasternUnderwriters Ass'n, 322 U.S. 533 (1944), the Supreme Court held that state efforts to regulate the business of insurance created an unconstitutional burden on interstate commerce. Congress returned broad authority to the states to regulate the business of insurance, notwithstanding the Commerce Clause, by enacting the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq.
[6] Under this analysis, courts have held that foreign insurers are subject to a state's insurance laws where they are licensed in that jurisdiction. See, e.g., Osborn v. Ozlin,310 U.S. 53 (1940). A state may also regulate a foreign insurer that mailed insurance contracts executed elsewhere to residents of that state. See, e.g., Travelers Health Ass'n v. Virginia ex rel.State Corp. Comm'n, 379 U.S. 643 (1950); Hooperstown Canning Co.v. Cullen, 318 U.S. 313 (1943). In an earlier opinion, this office concluded that sufficient minimum contacts exist to impose Maryland law on a foreign insurer where the insurance contract was executed outside the State but where the "insurer is licensed in Maryland, the group insured by the health contract consists of a substantial number of Maryland residents or others who work in Maryland, and the services for which benefits are sought are to be rendered in Maryland." 65 Opinions of the Attorney General 266, 274 (1980).
[7] We understand that an HMO's provider contract must be filed with the Insurance Administration, which reviews them to ensure that they include "hold harmless" language set forth in HG, § 19-710(o). If the HMO used the same provider contract for its in- and out-of-state providers, those out-of-state providers would also be contractually bound to comply with the hold harmless provisions.
 *Page 142